# 21-2563-cr

IN THE

# United States Court of Appeals

FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

vs.

NICHOLAS TURNQUIST,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
for the WESTERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT
## NICHOLAS TURNQUIST

SINGER LEGAL PLLC
ROBERT C. SINGER, ESQ.
*Attorneys for Defendant-Appellant Nicholas
Turnquist*
80 East Spring Street
Williamsville, New York 14221
Telephone: (716) 222-3288
Email: rob@singerlegalpllc.com

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ................................................................................i

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION AND SUMMARY OF ARGUMENT ............................1

JURISDICTIONAL STATEMENT ..............................................................3

QUESTION PRESENTED ...........................................................................3

STATEMENT OF THE CASE .....................................................................4

STATEMENT OF THE FACTS ...................................................................7

    A. Nicholas Turnquist and Miranda Kranz. ............................................7

    B. Allegations of sexual assault surfaced in 2012, but were
dismissed by Ms. Kranz, her mother, and authorities. ............................8

    C. Amanda Turnquist raises allegations of sexual abuse in
2015 following her separation from Mr. Turnquist. Once
again, the allegations were denied by Ms. Kranz and dismissed
by authorities. ........................................................................................9

    D. Following their divorce, Mr. Turnquist dates and eventually
remarries. Ms. Kranz continues to live with Mr. Turnquist
until she gets involved with a man whom she eventually marries. .......10

    E. Mr. Turnquist and Ms. Kranz had consensual sex
when Ms. Kranz was seventeen and eighteen years old. .....................11

    F. Leading up to 2020, Ms. Kranz grows to dislike
Mr. Turnquist. .....................................................................................12

    G. Ms. Kranz makes allegations of sexual assault to local
authorities. Local authorities investigate with assistance of
federal partners and arrest Mr. Turnquist. ..........................................13

H. Wyoming County, NY is the first jurisdiction to charge
Mr. Turnquist for sex crimes involving Ms. Kranz..................................13

I. In November 2020, Federal Authorities charge Mr. Turnquist
with a sex crime involving Ms. Kranz. ......................................................14

J. Genesee County, NY becomes the third jurisdiction to charge
Mr. Turnquist with a sex crime involving Ms. Kranz.............................14

K. Erie County, NY becomes the fourth jurisdiction to charge
Mr. Turnquist with a sex crime involving Ms. Kranz.............................15

L. The Wyoming County matter proceeds to trial and ends in a
directed verdict and dismissal of all charges against Mr. Turnquist. ...................15

    1. The trial testimony and evidence revealed that the
    allegations could not have occurred in 2010 and 2011
    when Ms. Kranz and other witness claimed she was raped. ...................16

M. The Wyoming County trial exposes other glaring inconsistencies
in Ms. Kranz and other witnesses' statements to the police,
prosecutors, the grand jury, and the court.  This leads defense
attorneys to file motions for bail in the remaining jurisdictions. .........................19

    1. Genesee County grants Mr. Turnquist bail in conformance
    with the District Attorney's recommendation.............................................24

    2.  Over the government's objection, the Federal Magistrate
    orders Mr. Turnquist release consistent with the Probation
    Office's recommendation. ................................................................................25

    3. Over the District Attorney's objection, the Erie County
    court grants bail to Mr. Turnquist................................................................26

N. The U.S. Attorney's Office – WDNY appeals the Magistrate
Judge's release order.......................................................................................27

    1. The government's arguments in favor of pretrial detention. ..............27

    2. Mr. Turnquist's arguments in support of his release............................29

O. The District Court rescinds the Magistrate's order and detains
Mr. Turnquist, reasoning that Mr. Turnquist poses a danger to
Ms. Kranz and others in the community that was not rebutted
and cannot be resolved through imposition of conditions...................32

LEGAL STANDARDS ..................................................................37

    A. Legal standard governing pretrial detention/release. .......................37

    B. Legal standard governing appeals of detention orders.....................40

ARGUMENT ............................................................................41

I.    The District Court clearly erred when it detained Mr. Turnquist
    pending trial. Mr. Turnquist rebutted the presumption of
    dangerousness and the conditions imposed by the Magistrate
    Judge reasonably assured the safety of Ms. Kranz and the
    community at large. .............................................................41

    A. The presumption of dangerousness was rebutted. The District
    Court's conclusion to the contrary applied an incorrect legal standard
    to reach a conclusion that is not supported by the record....................42

    B. The District Court's conclusion that dangerousness was proven
    by clear and convincing evidence and that no conditions would
    reasonably address those concerns was clearly erroneous. ...................45

        1. The District Court placed too much weight on nature of
        the offense and weight of the evidence prongs. .........................45

        2. The District Court appears to have found that Mr. Turnquist's
        history and characteristics did not warrant release. This finding is
        unsupported in the record and contrary to case law. ...............48

        3. The District Court found dangerousness, but did not address
        why conditions of release were inadequate to resolve those
        concerns and ensure safety............................................49

    C. The District Court failed to address Mr. Turnquist's concern that
    his ability to prepare for trial was hampered by his continued
    incarceration. ....................................................................54

CONCLUSION .........................................................................56

CERTIFICATE OF COMPLIANCE.................................................57

# TABLE OF AUTHORITIES

## Cases

*Anderson v. City of Bessemer City*, 470 U.S. 564 (1985) ........................................40

*Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863 (1994) ............................3

*United States v. Abuhamra*, 389 F.3d 309 (2d Cir. 2004) ......................................40

*United States v. Albannaa*, No. 12-CR-174S, 2013 U.S. Dist. LEXIS

    135618 (W.D.N.Y. Sep. 23, 2013) ..................................................................52

*United States v. Alston*, 420 F.2d 176 (D.C. Cir. 1969) ........................................47

*United States v. Chimurenga*, 760 F.2d 400 (2d Cir. 1985) ......................39, 51, 54

*United States v. English*, 629 F.3d 311 (2d Cir. 2011) ............................................39

*United States v. Jackson*, 823 F.2d 4 (2d Cir. 1987) ..............................................47

*United States v. Jones*, No. 08-MJ-1228-HBP, 2008 U.S. Dist. LEXIS

    46116 (S.D.N.Y. Jun.11, 2008) ......................................................................53

*United States v. King*, 818 F. 2d 112 (1st Cir. 1987) ..............................................4

*United States v. LaFontaine*, 210 F.3d 125 (2d Cir. 2000) ......................................40

*United States v. Mattis*, 963 F.3d 285 (2d Cir. 2020) ......................................*passim*

*United States v. Mendez*, No. 19-CR-00245-EAW, 2020 U.S. Dist. LEXIS

    105823 (W.D.N.Y. June 17, 2020) ..................................................................47

*United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001) ....................38, 39, 42

*United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) ............................47

*United States v. O'Connor*, No. 08-CR-0077, 2008 U.S. Dist. LEXIS

    26605 (N.D.N.Y. Apr. 2, 2008) ........................................................49

*United States v. Parker*, 65 F. Supp. 3d 358 (W.D.N.Y. 2014) ...........................49

*United States v. Renford*, No. 20-CR-80-A, 2020 U.S. Dist. LEXIS

    133159 (W.D.N.Y. July 28, 2020).................................................49

*United States v. Rivera-Banchs,* No. 6:20-CR-06046 EAW, 2020

    U.S. Dist. LEXIS 228063 (W.D.N.Y. Dec. 4, 2020) ........................... 49, 53

*United States v. Rodriguez*, 950 F.2d 85 (2d Cir. 1991) .................................. 42, 44

*United States v. Sabhnani*, 493 F.3d 63 (2d Cir. 2007) ................................... 37, 40

*United States v. Shakur*, 817 F.2d 189 (2d Cir. 1987)...........................................41

## Statutes

18 U.S.C. § 2423 ..................................................................... 4, 42

18 U.S.C. § 3142 ....................................................................*passim*

18 U.S.C. § 3145(c) ......................................................................3

18 U.S.C. § 3231 ..........................................................................3

28 U.S.C. § 1291 ..........................................................................3

## Rules

Fed. R. App. P. 32 ......................................................................57

## Constitutional Provisions

U.S. Const. amend VIII................................................................37

## INTRODUCTION AND SUMMARY OF ARGUMENT

Defendant-Appellant Nicholas Turnquist appeals from the September 30, 2021 order of District Judge John L. Sinatra, Jr., ordering him detained pending trial because of the alleged danger his release will pose to the community/alleged victim in this case.  As set forth in greater detail below, Mr. Turnquist is charged in this case and two other state jurisdictions with sexual assault of his de facto step-daughter when she was a child.  Mr. Turnquist also was charged in another jurisdiction with the same offense until July 2021 when that case went to trial and, on the third day of trial, the trial judge entered a trial order of dismissal, with prejudice. Following that dismissal, defense attorneys in this case, as well as in the other state cases filed bail motions requesting Mr. Turnquist's release from custody.  They did so because the first state trial, as short as it was, revealed multiple inconsistencies in the alleged victim's testimony.  Evidence even proved that the alleged victim lied under oath.

During August 2021 and September 2021, judges in the two remaining state jurisdictions where charges were pending granted Mr. Turnquist bail in amounts that he could afford.  In the federal case, the U.S. Probation Office recommended Mr. Turnquist be released on conditions, including home detention.  After one unsuccessful attempt at securing bail without a financial condition (Mr. Turnquist wanted to devote whatever monies he and his family possessed to paying the state bail amounts), the defense moved for release a second time and included a $50,000.00

1

surety in the proposal. Magistrate Judge Jeremiah McCarthy listened to the evidence and interviewed the surety. Magistrate Judge McCarthy then found that the government failed to prove that Mr. Turnquist presented a risk of flight or danger to the community that warranted his continued detention and ordered Mr. Turnquist released on conditions. The government appealed to District Judge John L. Sinatra, Jr. After reading the submissions and listening to oral argument, District Judge Sinatra overruled Magistrate McCarthy, finding that Mr. Turnquist presented a danger to the community and to the alleged victim and ordered him detained pending trial. This appeal followed.

Mr. Turnquist believes the District Court committed clear error in ordering his detention when three other judges and the U.S. Probation Office – all of which looked at the same evidence – concluded that release was appropriate. As set forth below, Mr. Turnquist rebutted the presumption that he was a danger and the government failed to prove that he was a danger and that detention was warranted by clear and convincing evidence. This is why the District Court erred in ordering detention. And this decision has hurt Mr. Turnquist because he has limited ability to prepare for a complex trial while he is in custody. This Court should reverse the District Court's order and release Mr. Turnquist from custody on the same conditions set by Magistrate Judge McCarthy or on other conditions it sees fit.

## JURISDICTIONAL STATEMENT

Mr. Turnquist appeals from an interlocutory order denying his pretrial release entered on September 30, 2021, in United States District Court for the Western District of New York, before the Honorable John L. Sinatra, Jr., United States District Judge.  Counsel for Mr. Turnquist filed a timely notice of interlocutory appeal on October 11, 2021.  The District Court had jurisdiction pursuant to 18 U.S.C. §§ 3142 and 3231.  The jurisdiction of this Court is invoked pursuant to 18 U.S.C. § 3145(c) and 28 U.S.C. § 1291.  18 U.S.C. § 3145(c) provides that "[a]n appeal from a release or detention order, or from a decision denying revocation or amendment of such an order, is governed by" 28 U.S.C. § 1291, which gives courts of appeal jurisdiction over "final decisions of the district courts."  Under the collateral order rule, this Court has jurisdiction to review certain orders "that do not terminate the litigation, but must, in the interest of achieving a healthy legal system, nonetheless be treated as final." *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867 (1994) (citations and internal quotation marks omitted).  The District Court's Order of Detention qualifies as such an order.

## QUESTION PRESENTED

1) Whether the District Court committed clear error by reversing Magistrate Judge McCarthy's release order and subsequently ordering Mr. Turnquist detained pending trial because he was a danger to the community and the alleged victim.

3

## STATEMENT OF THE CASE

On November 2, 2020, a criminal complaint was filed in the Western District of New York alleging that Mr. Turnquist committed a violation of 18 U.S.C. § 2423(a). *See* Joint Appendix at 7-17.[1] Mr. Turnquist, who already was in custody of authorities in Wyoming County, New York, appeared by video before the Western District of New York and was informed of the charges by Magistrate Judge Jeremiah McCarthy on November 6, 2021. A.2. At the initial appearance, the government moved for Mr. Turnquist's detention. *See id.* Mr. Turnquist, then represented by AFPD Fonda Kubiak, elected to waive a detention hearing at that time, reserving his right to a hearing upon a change in circumstances, because Mr. Turnquist was in state custody. *See id*; *see also United States v. King*, 818 F. 2d 112, 115, n. 3 (1st Cir. 1987) (permitting a defendant to defer a federal detention hearing until state custody is resolved). Magistrate Judge McCarthy continued Mr. Turnquist's detention. A.18-19.

On February 3, 2021, Indictment 21-CR-15-JLS was filed, charging Mr. Turnquist with one count of a violation of 18 U.S.C. § 2423(a)&(e). (Transporting or Attempting to Transport a Minor Across State Line to Engage in Sexual Activity). A.20-21. The offense allegedly occurred in Erie, Pennsylvania on or about December 23-24, 2014. *See id.* Following arraignment, Mr. Turnquist waived a detention hearing and the Magistrate Judge continued Mr. Turnquist's detention because he remained in

---

[1] Hereinafter, citations to the Joint Appendix will be referenced as "A.__."

state custody at a bail amount that was unaffordable. A.3; A.22-23. It was Mr. Turnquist's desire to challenge his federal detention if his bail in Wyoming County was reduced by the trial court or appellate division. Counsel also set a scheduling order that pushed out motion and discovery dates by several months because Wyoming County was in the process of scheduling a trial, A.3, but that process was delayed due to the COVID-19 closure of New York State courts.

Over the course of the next five months, the government provided voluntary discovery and Mr. Turnquist prepared for trial in Wyoming County. In July 2021, the Wyoming County court entered a trial order of dismissal. Following the dismissal, Mr. Turnquist's federal defense attorney obtained access to several more gigabytes of discovery disclosed to his state defense attorneys. Mr. Turnquist's federal defense attorney also became aware of false testimony the alleged victim gave on the stand during the Wyoming County trial. Based on this new evidence as well as the fact that the unaffordable Wyoming County bail amount no longer existed, Mr. Turnquist's state and federal defense attorneys filed motions for bail in each of the jurisdictions where charges remained pending.

On August 21, 2021, Mr. Turnquist filed a motion for release from custody. A.24-101. Magistrate Judge McCarthy, who was assigned by the district court to oversee pretrial matters, A.2, set a briefing schedule and ordered the U.S. Probation Office to prepare a bail report, A.3. Magistrate McCarthy heard argument

on the motion on September 9, 2021. A.4; A.289-308. Following argument, Magistrate McCarthy denied Mr. Turnquist's motion, without prejudice, upon submission of a different bail package. *See id.*

Mr. Turnquist filed a second motion for release from custody on September 13, 2021. A.272-78. This proposal included a financial surety who offered a $50,000.00 bond secured by property. *See* Confidential Joint Appendix at 8-24.[2] Magistrate McCarthy heard argument on the second motion on September 17, 2021. A.4-5; A.309-33. Magistrate McCarthy granted Mr. Turnquist's motion and ordered him released on conditions. *See id.* The government requested a stay pending a decision whether to appeal the ruling. *See id.*

On September 22, 2021, the government appealed Magistrate Judge McCarthy's release order. A.334-57. District Judge Sinatra set a briefing schedule. A.5. On September 30, 2021, the District Court held oral argument on the government's appeal and ordered Mr. Turnquist detained finding that he was a danger to others and the community, that Mr. Turnquist had not introduced sufficient evidence to rebut the presumption of dangerousness, and that no condition or a combination of conditions would reasonably assure the safety of the community, if he were released pending trial. A.5-6; A.381-406.

---

[2] Hereinafter, citations to the Joint Confidential Appendix will be referenced as "CA.__."

Mr. Turnquist filed a notice of interlocutory appeal of this order on October 11, 2021. A.407. This appeal followed. Currently, the District Court is entertaining Rule 12 motions and those motions remain pending. A trial date has not been set.

## STATEMENT OF THE FACTS

Nicholas Turnquist has been in custody since April 2020. At that time, authorities in Wyoming County in the State of New York charged Mr. Turnquist with a sex crime involving his de facto step daughter, Miranda Kranz. A.26. Since April 2020, federal and state authorities have charged Mr. Turnquist with sexual crimes committed against Ms. Kranz in four different jurisdictions. To date, only one of these cases is resolved (a dismissal in favor of Mr. Turnquist).

### A. Nicholas Turnquist and Miranda Kranz.

Miranda Kranz is the biological daughter of Amanda Turnquist. Ms. Kranz was born to a different biological father (Mark Rotino). When Ms. Kranz was in elementary school, Amanda Turnquist met Mr. Turnquist. Amanda and Nicholas Turnquist started a relationship and eventually got married in 2013. When Ms. Kranz was a child, she lived with Amanda Turnquist and Nicholas Turnquist (Mr. Rotino did not have custody of Miranda and had little to no involvement in her life). Mr. Turnquist did not formally adopt Ms. Kranz, but he essentially served as a

father-figure to Ms. Kranz during her formative years.  The Turnquists had two biological children (R.T. and M.T.) and raised them with Ms. Kranz.

The Turnquists lived in several homes when Ms. Kranz was young and also lived for a period of time with Mr. Turnquist's mother, Patti Turnquist.  CA.1-2.  These homes were located in Wyoming County, NY, Erie County, NY, and Genesee County, NY.  The Turnquists also traveled on vacations outside of New York.  During this entire period, Mr. Turnquist was employed as a volunteer firefighter, a corrections officer, and was self-employed in the construction and medical equipment businesses.  CA.2.  He does not have a criminal record and has no history of drug and/or alcohol abuse.  CA.3-6.  Ms. Kranz attended local public elementary and secondary schools.  She was an average student and had some behavior issues in school.

In July 2010, Ms. Kranz was hit by a car while playing outside when she was twelve years old.  Mr. Turnquist witnessed this accident.  Ms. Kranz suffered severe injuries and had a long recovery following the accident.

**B. Allegations of sexual assault surfaced in 2012, but were dismissed by Ms. Kranz, her mother, and authorities.**

In January 2012, New York Child Protective Services ("CPS") opened an investigation with local authorities into a report that Mr. Turnquist had inappropriate sexual contact with Ms. Kranz.  The report came to the attention of CPS and the

police when a mandatory reporter at Ms. Kranz's school heard a rumor that Mr. Turnquist had sexual intercourse with Ms. Kranz and reported it to the NYS Hotline.  A.72-92.  Ms. Kranz was 13 years old at the time of the report.

CPS and local police visited the Turnquist home and interviewed Ms. Kranz, Mr. Turnquist, and Amanda Turnquist in January 2012 and March 2012. A.72-92.  All three denied the allegations.  A.72-92.  Ms. Kranz told investigators that the allegations were fabricated by her friends Brook Mason, Keisha Doman, and Dylan Crane, who were bullying her.  A.74; A.91.  CPS and the police followed up with interviews of the school principal and social worker as well as Ms. Krantz's therapist, Maggie Dreyer.  Everyone denied that Ms. Kranz told them she was being abused and all denied having concerns of abuse.  A.75-83; A.89; A.92.  CPS suggested to Amanda Turnquist that she bring her daughter to the Child Advocacy Center for a forensic interview, but Amanda told CPS she did not believe that was necessary. A.80-82.  The case was closed as unfounded in March 2012.

### C. Amanda Turnquist raises allegations of sexual abuse in 2015 following her separation from Mr. Turnquist.  Once again, the allegations were denied by Ms. Kranz and dismissed by authorities.

Nicholas and Amanda Turnquist separated when Ms. Kranz was a teenager.  Ms. Kranz did not get along with Amanda, so she moved in with Mr. Turnquist.  Later, the Family Court determined that Mr. Turnquist (rather than Amanda) should serve as the primary custodial parent to R.T. and M.T., the couple's

biological children.  Amanda Turnquist resented this.  Mr. Turnquist having primary custody of all of Amanda's biological children caused a lot of friction in the family.

In July 2015, Amanda Turnquist contacted local police and alleged that Mr. Turnquist was engaging in sexual activity with Ms. Kranz.  A.37.  Ms. Kranz was 17 years old at this time.  Amanda Turnquist based these allegations on something she allegedly observed on Ms. Kranz's cellphone.  Amanda Turnquist first called the police and reported she found inappropriate texts and pictures on the phone.  A.37. She next attempted to drive to the police station, but Ms. Kranz refused to let her leave by blocking the car.  A.37.  After getting past Ms. Kranz, Amanda went to the police station with her daughter's phone.  When she arrived at the police station, Amanda could not produce the pictures, but produced the text messages.  A.37.  The police told Amanda that no crime was committed based on their review of the messages as well as the fact that Ms. Kranz was 17 years old (the legal age of consent in New York).  A.37.

### D. Following their divorce, Mr. Turnquist dates and eventually remarries.  Ms. Kranz continues to live with Mr. Turnquist until she gets involved with a man whom she eventually marries.

Following the divorce, Mr. Turnquist dated Amber Talarico and Carly Bunce in the 2016 to 2018 time period.  Ms. Kranz was 17-19 years old during this period.  Mr. Turnquist married Carly Bunce in 2018 when Ms. Kranz was approximately 19-20 years old.  Ms. Bunce lived with Ms. Kranz and her younger

step-sisters at Mr. Turnquist's house before and after the marriage.  When Ms. Kranz

was 18 years old in 2016-17, she started dating Justin Kranz.  Her relationship with

Justin Kranz caused friction between Ms. Kranz and Mr. Turnquist because

Mr. Turnquist did not want Justin Kranz sleeping in his house.  In March 2017,

Mr. Turnquist no longer wanted Ms. Kranz and Justin Kranz to live in his house.

Ms. Kranz moved out with Justin for a period, returned to the house for another brief

period in Spring/Summer 2017, and eventually moved out completely with Justin

Kranz thereafter.  Ms. Kranz and Justin Kranz got married following her departure.

### E. Mr. Turnquist and Ms. Kranz had consensual sex when Ms. Kranz was seventeen and eighteen years old.

While living together in 2015, 2016, and 2017, Mr. Turnquist and

Ms. Kranz had sexual intercourse on several occasions when Ms. Kranz was 17[3] and

18 years old.  Some of these encounters involved Carly Bunce-Turnquist.  All of these

encounters occurred within the state of New York at Mr. Turnquist's home.

Mr. Turnquist and Ms. Kranz openly discussed these encounters in text messages in

February 2017.  A.151-270.  In the text messages, Ms. Kranz (who was 18 years old at

the time) initiates several of the sexual encounters.  A.151-270.  Amanda Turnquist

did not know about these encounters at first, but later learned about them in 2018 and

confronted Mr. Turnquist.  These encounters also complicated Ms. Kranz's

---

[3] The legal age of consent in New York State is 17 years old.

relationship with Justin Kranz, who was not aware of the encounters (some occurred when Ms. Kranz was dating Justin Kranz).

### F. Leading up to 2020, Ms. Kranz grows to dislike Mr. Turnquist.

Ms. Kranz and Justin Kranz moved out of Mr. Turnquist's house in March 2017 and, after moving back for a short time, moved out permanently in summer 2017. Ms. Kranz married Justin Kranz in February 2018. Mr. Turnquist was invited to the wedding by Ms. Kranz. He attended without objection. The Kranzs had a baby thereafter. Ms. Kranz involved Mr. Turnquist in her newborn's life. Again, nobody objected to this. At the same time, Amanda Turnquist and Ms. Kranz became increasingly dissatisfied with the fact the Mr. Turnquist continued to serve as the primary custodial parent to R.T. and M.T. Tensions developed over: R.T.'s sexual preference and Mr. Turnquist's acceptance of her homosexuality; R.T.'s use of social media that Mr. Turnquist disallowed when Ms. Kranz was a teenager; a CPS report of abuse and neglect filed against Ms. Kranz by an anonymous party that involved her newborn; and, an anonymous complaint about Ms. Kranz's dog to a local dog warden. A.38. Mr. Turnquist, Ms. Kranz, and Amanda Turnquist could not resolve these differences amicably. Amanda and Ms. Kranz blamed Mr. Turnquist for them. Things deteriorated to the point where Ms. Kranz chose to make a police report against Mr. Turnquist.

### G. Ms. Kranz makes allegations of sexual assault to local authorities. Local authorities investigate with assistance of federal partners and arrest Mr. Turnquist.

In February and March 2020, Ms. Kranz filed a police report alleging that Mr. Turnquist sexually assaulted her when she was a child. She made a supporting deposition to East Aurora Police. In March 2020, she also agreed to conduct a controlled call with Mr. Turnquist that was recorded by the police. In April 2020, authorities continued to build a case against Mr. Turnquist based on what Ms. Kranz and Amanda Turnquist alleged. Authorities secured a search warrant and executed a search on Mr. Turnquist's home. At the same time, local police interrogated Mr. Turnquist for several hours. He adamantly denied all allegations of sexual assault, but admitted that he and Ms. Kranz had consensual sex, something that he was not very proud of. A.119. Following his interrogation, Mr. Turnquist was arrested and incarcerated.

### H. Wyoming County, NY is the first jurisdiction to charge Mr. Turnquist for sex crimes involving Ms. Kranz.

In April 2020, Wyoming County authorities formally charged Mr. Turnquist with the sexual assault of Ms. Kranz when she was a minor and in the custody of Mr. Turnquist. An indictment followed. A.116-17. The state court set bail at $1,000,000.00 (an amount Mr. Turnquist could not afford) and Mr. Turnquist remained in state custody.

13

### I. In November 2020, Federal Authorities charge Mr. Turnquist with a sex crime involving Ms. Kranz.

In November 2020, federal authorities in the Western District of New York filed charges against Mr. Turnquist for a sexual assault that allegedly occurred in Erie, Pennsylvania in 2014 when Ms. Kranz was 16 years old.  A.7-17.  The charges alleged that Mr. Turnquist sexually assaulted Ms. Kranz while on a family trip to Splash Lagoon, a water park.  The criminal complaint was followed by an Indictment in February 2021.  A.20-21.  Following arraignment, Mr. Turnquist waived his detention hearing asking for leave to bring a motion for release if his state bail amount in Wyoming County was reduced or the trial ended in acquittal.[4]  A.3.  The Magistrate Judge permitted this and issued a detention order.  A.3; A.22-23.

### J. Genesee County, NY becomes the third jurisdiction to charge Mr. Turnquist with a sex crime involving Ms. Kranz.

In Winter 2021, Mr. Turnquist was charged with sexual offenses involving Ms. Kranz in Genesee County, New York.  A.27.  The charges alleged that Mr. Turnquist sexually assaulted Ms. Kranz while she lived at a different address with him during the same period when illegal sexual activity was allegedly ongoing within New York State.  A.126.  In Genesee County, the state court remanded Mr. Turnquist

---

[4] At the time of the federal arraignment in February 2021, Mr. Turnquist's state defense counsel was in the process of filing an appeal with the New York State Appellate Division, Fourth Department, arguing the bail amount set in Wyoming County was excessive.

based on the $1,000,000.00 amount set in Wyoming County (if Mr. Turnquist could not afford bail in Wyoming County, then setting bail in Genesee County did not matter for practical purposes), but permitted Mr. Turnquist to renew his request for bail if circumstances changed. As such, Mr. Turnquist remained in custody in Wyoming County.

### K. Erie County, NY becomes the fourth jurisdiction to charge Mr. Turnquist with a sex crime involving Ms. Kranz.

On July 8, 2021, Erie County, New York became the fourth jurisdiction to charge Mr. Turnquist with sex offenses involving Ms. Kranz. A.27-28. The charges alleged that Mr. Turnquist sexually assaulted Ms. Kranz while she lived at a different address with him during the same period when illegal sexual activity was allegedly ongoing within New York State. A.128-29. In Erie County, the state court remanded Mr. Turnquist based on the $1,000,000.00 amount set in Wyoming County (if Mr. Turnquist could not afford bail in Wyoming County, then setting bail in Erie County did not matter for practical purposes, either), but permitted Mr. Turnquist to argue for bail if circumstances changed. As such, Mr. Turnquist remained in custody in Wyoming County awaiting trial.

### L. The Wyoming County matter proceeds to trial and ends in a directed verdict and dismissal of all charges against Mr. Turnquist.

In mid-July 2021, the Wyoming County matter proceeded to trial after being delayed due to the COVID-19 pandemic. The People called two witnesses in

their case-in-chief: East Aurora Investigator Aaron Anderson (one of the lead investigators) and Miranda Kranz (the alleged victim). At the conclusion of Ms. Kranz testimony on the third day of trial, Mr. Turnquist's counsel moved to dismiss the indictment based on the inconsistent, unconvincing, and false trial testimony of Ms. Kranz. The Court granted the motion.

> **1. The trial testimony and evidence revealed that the allegations could not have occurred in 2010 and 2011 when Ms. Kranz and other witness claimed she was raped.**

In this case, Wyoming County prosecutors charged Mr. Turnquist with predatory sexual assault occurring on or about October 1, 2010 to June 1, 2011 and Rape – 2nd Degree occurring on or about December 1, 2011 to January 6, 2012. A.116-17. Under New York law, the predatory sexual assault charge required proof that the alleged victim was under the age of 13 years old at the time of the sexual activity. Prosecutors brought these charges based on Ms. Kranz statements to investigators, her grand jury testimony, and other people's grand jury testimony and statements that Mr. Turnquist started to touch Ms. Kranz inappropriately in or about November 2010 and began having sexual intercourse with her in or about February 2011.

Ms. Kranz and witnesses, including Amanda Turnquist, linked the start of the abuse to two "outcries" that they said were made during the period charged in the indictment. One of the "outcries" related to a statement Ms. Kranz allegedly

made to Amanda Turnquist, during a trip to Walt Disney World, Florida. On that trip, Ms. Kranz claimed that the family was sharing a hotel room. A.97. One night at the beginning of the vacation, Nicholas and Amanda Turnquist were sleeping in a bed next to Ms. Kranz. A.97. Mr. Turnquist allegedly demanded sex from Amanda. A.97. Ms. Kranz claims she witnessed this and became uncomfortable, so she told her mother that Mr. Turnquist "has sex with me when you are at work," or words to that effect. A.97. Amanda Turnquist allegedly confronted Ms. Kranz about this declaration, but Ms. Kranz told her mother that she was lying. A.97-99. In July 2020, following months of investigation by the police and the family, Ms. Kranz and her mother told investigators and the Wyoming County Grand Jury that the trip to Disney occurred in February 2011. A.96; A.47.

The other "outcry" related to the statement Ms. Kranz allegedly told four friends in middle school: Kyesha Domon, Brooke Mason, Elizabeth Etchevery, and Dillon Crane. *See* Facts, Section B, *supra*, at 9-10. Contrary to what she told the police and CPS in 2012, Ms. Kranz now claimed that she told her friends at lunch that "my step-dad is having sex with me," or words to that effect, sometime in January 2012. A.47.

At trial, the defense confronted Ms. Kranz with CPS records provided to the defense by Wyoming County prosecutors. According to the record, Ms. Kranz

17

*denied* that Mr. Turnquist was sexually abusing her in 2012 and claimed the allegations

*were fabricated* by Mason, Domon, and Crane, all of whom were bullying her:

> I introduced myself again to Miranda and explained my role to her. She stated that she was aware of what was going on and that I just needed to talk to her about it. She stated that she has been having problems with school and people bullying her. She stated that it has been going on for two years. She previously went to East Aurora to school. She liked it better there and would like to go back there. I asked her what has been going on. She stated that these students at school have made this stuff up about her. I asked if there is any truth to it and she stated that there is not. She stated that she gets along well with Nick and that she can talk to him better than she can to her mother at times. She stated that they are saying things about her uncles also having sex with her. She denied that this is true. I asked if anything has been going on with Nick and she stated that no nothing is going on. She stated that these girls have made her life miserable. I asked if she sees her father and she stated not much. She did see him on Christmas day. She stated that her father lives with his girlfriend. She stated that her mother works at the East Aurora Country Club, so they are home with Nick a lot. He is a contractor and self employed. She stated that she goes to her grandmother's on weekends and she likes this as she can see her old friends. Miranda gave me the names of the people causing her grief ; Brook Mason, Keisha Doman, and Dylan Crane is her former boyfriend. he was stalking her so he has caused her problems since they broke up.

A.74; A.60-61. The defense also confronted Ms. Kranz with the CPS progress notes

showing that the Disney trip could not have occurred, at the earliest, until February

2012, not February 2011 as claimed to Wyoming County authorities and testified to

by Ms. Kranz:

> **Progress Notes Narrative:**
>
> H.V. to residence. All family members were present. I explained to Amanda that I was just making a follow up visit to see how things are going. She explained that things are going very well. she stated that things at school have settled down. I asked to speak to Miranda alone. We sat in the kitchen to talk. She stated that everything is going fine. She reports no problems at home or at school. She feels that things are better at school. She stated that she has been accepted at Immaculata but she does not want to go there as you have to wear a uniform. She hopes to be going to East Aurora to school next year. They have not sold their home yet, but she is hoping. I explained to MIranda if she has problems to go to someone in school that she can talk to and she agreed to do this. I then went into the living room to speak with Amanda. Nick and the younger children were there. Miranda also came in at some point. Amanda talked about the fact that they just went to Florida to Disney. They all had fun except that they drove. Amanda feels that they did square things away with the school and this is better. She stated that they hope to move by summer so that they will be in the East Aurora district. Their home is for sale and they are trying to sell it. She stated that MIranda is continuing to go to Maggie Dreyer for counseling and this is helpful. They feel that MIranda is comfortable with this person and this is a good thing. I explained that I will be closing the case and un founding it and they will receive a letter to that effect.

A.83.

Based on the inconsistencies in Ms. Kranz's testimony and the inability of the People to prove that the sexual assault allegations occurred within the 2010-2012 period charged in the indictment, the Court dismissed the indictment.

**M. The Wyoming County trial exposes other glaring inconsistencies in Ms. Kranz and other witnesses' statements to the police, prosecutors, the grand jury, and the court. This leads defense attorneys to file motions for bail in the remaining jurisdictions.**

Beyond the inconsistencies noted above and the fact that Ms. Kranz denied that Mr. Turnquist was abusing her in 2012, Ms. Kranz testified inconsistently, made inconsistent statements about other key facts, and claimed a lack of memory or issued denials for other matters that were contradicted by the evidence. This was revealing to the defense because Ms. Kranz testified in the Wyoming County matter that she knew the facts of her case "better" in July 2021 than when she originally made these allegations to the police in March 2020:

```
2        Q    Okay, do you remember it better today than you did
3   last year?
4        A    Definitely I do.
5        Q    And why is that?
6        A    Because I've spent the last year-and-a-half of my
7   life looking into it.
```

A.54.

For example, Ms. Kranz testified at the Wyoming County trial that Mr. Turnquist raped her on multiple occasions from Summer 2012 until November

2013 when they lived at Patti Turnquist's house (Mr. Turnquist's mother) on Davis

Road in West Falls, NY.  A.49-50.  However, this testimony is inconsistent with what

Ms. Kranz told investigators in 2020 and also is absent from her 2020 supporting

deposition that led to Mr. Turnquist's arrest:



A.33.  And her testimony on July 28, 2020 before the Wyoming County Grand Jury

makes things even more murky.  At that time, Ms. Kranz discussed her move to Patti

Turnquist's house in 2012, but also discussed her move to another house in 2013 and

stated as follows:

```
11    Q.    And was there a time when you moved from
12    Torrey Hill Road?
13    A.    Yes.
14    Q.    All right.  Do you recall when that was?
15    A.    June of 2012.
16    Q.    June of '12?
17    A.    Uh-hmm.
18    Q.    And to where did you move?
19    A.    They had moved in with his mom for a little
20    while, Nick's mother for a little while.  Then we had
21    moved to other places, too.
22    Q.    And I'm not gonna get into details, but did
23    Mr. Turnquist continue to have intercourse with you
24    during that time period?
25    A.    Yes.
```

A.33.

What' more, at the Wyoming County trial, Ms. Kranz alleged that Mr. Turnquist sexually assaulted her when she was 17 and 18 years old in New York. On cross-examination, defense counsel asked Ms. Kranz about the text messages she sent to Mr. Turnquist in 2017 wherein she stated that she was "in love" with him, asked him for sexual favors, and expressed her desire to perform sexual acts upon him.  A.62; A.68-70; A.152-270.  Rather than admitting to sending the texts – which clearly state these things – Ms. Kranz claimed not to "know" her telephone number, claimed not to "recall" sending the messages, and later claimed that she "didn't" send the messages at all.  A.62; A.68-70.  A review of Mr. Turnquist's 2017 billing records revealed that Ms. Kranz was the user of the (716) 982-7216 number that she denied at trial.  A.34.

Finally, defense investigators found a police report that showed that Ms. Kranz made a false allegation of sexual assault against another man in the past. In 2011, Ms. Kranz claimed that Dillon Crane sexually assaulted her on a school bus. According to Ms. Kranz, Crane forcibly put his hand up her shirt and touched her vaginal area above her clothing.  When the Turnquists learned about the allegation, they contacted the school and the police.  Investigators opened an investigation and interviewed Crane who denied the allegation and claimed his actions were consensual.

A.102.  Investigators then interviewed Ms. Kranz and viewed surveillance video from

the school bus.  The investigation revealed as follows:

> SRO Soderland recontacted Chief Laird and advised that the video tape from the bus showed what would appear to be Miranda being the aggressive one with kissing and that there were other kids watching. SRO Soderland advised the parents of the tape and felt that no follow-up would be necessary.
>
> 11-19-2011 Chief Laird made contact with Mr. Turnquist in regards to the tape, etc, Mr. Turnquist stated that Miranda had changed her story several times - that along with the tape convinced Mr. Turnquist that he did not want to get the boy in trouble if it was not a good case.  No further action was requested.
>
> Case Closed.

A.102.

> As for the other witnesses, like her daughter, Amanda Turnquist also did

not believe the allegations in 2012, thought the allegations were the result of bullying

of Ms. Kranz by Mason, Domon, and Crane, and even refused to send Ms. Kranz to a

CAC forensic interview.  A.79; A.81-83; A.91-92.  Police investigation into the 2012

allegations confirmed that Ms. Kranz, Mason, Domon, and Crane were having

"ongoing issues at school" and after interviewing Domon and Mason[56], the police

---

[5] Dillon Crane was not interviewed by Investigators in 2012, but he was interviewed
by Investigator Anderson in April 2020.  At that time, Mr. Crane reported that
Ms. Kranz "was a drama queen in school" and that Ms. Kranz "never disclosed to
him anything concerning something going on between her and [Mr. Turnquist]."A.31.

[6] When interviewed by the FBI in March 2021, Mason did not recall the disclosure to
the school, but claimed that around the same time, she and Etchevery witnessed
Ms. Kranz express concern about living with Mr. Turnquist at a sleepover.
Ms. Mason went on to tell the FBI an elaborate story about why she and Etchevery
suspected sexual abuse and went to a guidance counselor at Pioneer School to report
their concern.  However, Ms. Mason suffered a traumatic brain injury and Wyoming
County prosecutors believed her testimony was unreliable.  A.31.

concurred with unfounding the allegations against Nicholas Turnquist. Furthermore,

Ms. Kranz and her mother made several conflicting statements regarding counseling.

Amanda Turnquist claims that she brought her daughter to a mental health counselor

during the 2012 investigation:

> Inv. ANDERSON later spoke with Miranda's mother -Amanda STROMECKI via phone who advised that Miranda did meet with her councilor in Buffalo on Saturday. STROMECKI had NO concerns of her fiance'

A.92. But in the 2020 investigation, Ms. Kranz denied her mother ever did this:

> school was done with in the Spring/Summer of 2012. Regarding the sex offense that Inv. ANDERSON handled in 2012, her mother advised Inv. ANDERSON that Miranda had met with her counselor on that Saturday in Buffalo and that the information reported from her former friends was done to bully and embarrass her. Miranda advised that she HAD NOT seen a counselor since being hit by a vehicle in 2011 and her mother NEVER DID take her to speak with any counselor regarding the allegations and only advised that she had.

A.36. In 2020, Amanda Turnquist stated in her supporting deposition that she

recalled a time when counselor Dreyer allegedly raised concerns about sexual abuse:

> FOR A TIME MIRANDA HAD A COUNSELOR BECAUSE SHE WAS SO ANGRY AFTER HER ACCIDENT WHEN SHE WAS STRUCK BY A CAR. THE COUNSELOR , MAGGIE DRYER ON ONE OCCASION BROUGHT MIRANDA OUT OF A SESSION AND STATED THAT SHE BELIEVED MIRANDA MAY HAVE BEEN INVOLVED IN A SEXUAL ENCOUNTER OR WAS BEING ABUSED SEXUALLY. NEXT THE COUNSELOR QUESTIONED MIRANDA IN FRONT OF ME AND IT WAS AWKWARD AND MIRANDA DENIED ANYTHING HAPPENED. I ALSO REMEMBER THAT NICK DIDN'T WANT HER TO

A.36. But when this information was investigated by law enforcement and Counselor

Dreyer was interviewed, Counselor Dreyer denied this. As FBI Special Agent Randy

Garver cautioned in the Criminal Complaint:

23

Victim recanted her statement. In the same deposition, VM recalled Victim seeing a counselor after being struck by a vehicle. On one occasion, the counselor told VM that she thought Victim had "been involved in a sexual encounter or was being sexually abused." I note for the Court that when law enforcement later contacted the counselor, she recalled Victim being one of her clients, but did not recall having any concerns of sexual abuse.

A.12.

In light of the above and with the $1,000,000.00 bail amount now removed because of the dismissal in Wyoming County, defense attorneys in Erie County, Genesee County, and the federal case moved for Mr. Turnquist's release.

### 1. Genesee County grants Mr. Turnquist bail in conformance with the District Attorney's recommendation.

The first court to entertain a bail motion was Genesee County, NY. Mr. Turnquist filed a new bail application on August 18, 2021. The application discussed the Wyoming County dismissal, the inconsistencies revealed during that trial, and some of the unbelievable testimony delivered by Ms. Kranz. After reviewing the evidence, the Court granted Mr. Turnquist bail *and adopted the District Attorney's recommendation* for bail: $10,000.00 (cash bail); $20,000.00 (bond); or $30,000.00 (secured surety bond).

2. **Over the government's objection, the Federal Magistrate orders Mr. Turnquist release consistent with the Probation Office's recommendation.**

The federal court was the second court to entertain bail. A.24-101. Magistrate Judge McCarthy ordered the U.S. Probation Office to prepare a bail report, A.3. The Probation Office did as directed. The Probation Office verified that Mr. Turnquist did not have a criminal record; was married; had children; lived in the area all his life; had family support; had a long history of legitimate employment; was the protected person in an order of protection, but not the subject of an order; did not suffer from a substance abuse disorder; was in good medical health; and, but for the allegations made by Ms. Kranz, did not have a history of involvement with law enforcement. CA.1-7. Based on Mr. Turnquist's history and characteristics as well as the facts of this case, the Probation Office recommended that Mr. Turnquist be released on conditions because those conditions would ensure both his appearance and the safety of the community. CA.6-7.

Magistrate McCarthy heard argument on the motion, but initially denied Mr. Turnquist's motion, without prejudice, upon submission of a different bail package because the initial bail package proposed by the defense did not contain any financial condition or surety. A.4; A.289-308. A few days later, Mr. Turnquist filed a second motion for release from custody which included a financial surety who offered a $50,000.00 bond secured by property. A.272-78; CA.8-24. Magistrate McCarthy heard argument on the second motion and interviewed the surety, Patricia Turnquist,

25

the defendant's mother.  A.4-5; A.309-33.  After hearing argument, Magistrate Judge

McCarthy found that Mr. Turnquist had rebutted the presumption that no conditions

would ensure his appearance or the safety of the community, the government had

neither shown that Mr. Turnquist was a flight risk by a preponderance of the evidence

nor a danger to the community by clear and convincing evidence, and granted

Mr. Turnquist's motion, ordering him released on the conditions recommended by

the Probation Office.  A.4-5; A.323-33.  The government requested a stay pending a

decision whether to appeal the ruling to the District Judge.  A.4-5; A.328.  In the

interim, Patti Turnquist's surety materials were reviewed by the U.S. Attorney's Office

– WDNY and the office concluded that her financial interest in the property was

adequate to sign the federal surety bond.  A.361.

### 3. Over the District Attorney's objection, the Erie County court grants bail to Mr. Turnquist.

One week later, Erie County court held a bail hearing regarding

Mr. Turnquist.  The District Attorney opposed release.  When arguing for remand and

release, the prosecution and the defense presented the same evidence offered in

Genesee County and in Federal Court.  At the conclusion of the hearing, the Erie

County court granted Mr. Turnquist bail and set bail at $100,000.00 (cash) and

$250,000.00 (bond or surety).

### N. The U.S. Attorney's Office – WDNY appeals the Magistrate Judge's release order.

The government appealed Magistrate Judge McCarthy's release order the same day that Erie County granted bail. A.334-57. Mr. Turnquist submitted his opposition and the government replied. A.358-80. On September 30, 2021, the District Court held oral argument.

### 1. The government's arguments in favor of pretrial detention.

On appeal, the government offered several arguments in favor of keeping Mr. Turnquist detained pending trial. First, the government argued that Mr. Turnquist was charged with a very serious offense that carried a mandatory minimum sentence of 10 years confinement. A.342.

Second, the government argued that the evidence in this case was strong. In making this argument, the government relied on the fact that M.T., who was 5 years old at the time of the federal offense, told investigators that she had witnessed Ms. Kranz "on top" of Mr. Turnquist in a hotel room in Pennsylvania and had heard Ms. Kranz say "stop" and Mr. Turnquist say that he was the "adult" and would do "what he wanted." A.343; A.14. The government referenced a jail call in which Mr. Turnquist asked his wife to look up the age of consent in several states, including Pennsylvania, as a means to defend against this charge or to defeat other potentially uncharged acts of rape. A.333-34. The government also pointed to the March 2020 controlled call in which the government claims that Mr. Turnquist made an admission

about having sexual contact with Ms. Kranz when she was a minor and his

interrogation in which he admitted to having sexual intercourse with Ms. Kranz when

she was 17/18 years old. A.334-35.

   Third, the government argued that Mr. Turnquist did not rebut the

presumption that he was a danger to the community and/or a person in the

community. A.345-46. The government argued that Mr. Turnquist presented a threat

to Ms. Kranz, Amanda Turnquist, and other witnesses because he allegedly engaged in

a pattern of physical (and other) abuse against these persons. A.345; A.374-75. The

government cited to the fact that Carly Turnquist was charged with witness tampering

involving Ms. Kranz. A.346. The government claimed that Mr. Turnquist did not

present evidence of his lack of dangerousness. A.346; A.375. The government

argued that the $50,000.00 surety bond did not overcome the presumption or quell

the concern over Mr. Turnquist's dangerousness. A.346; A.375-76. Regarding

dangerousness, the government stated that it feared that Mr. Turnquist would sexually

abuse his other minor daughters and Magistrate Judge's condition that any contact

with a minor be supervised was insufficient because Carly Turnquist "could not be

trusted" to act as a supervisor because she engaged in sexual contact with Ms. Kranz,

she was charged with witness tampering of Ms. Kranz during the Wyoming County

matter, and she had a pending felony DWI charge for driving while intoxicated with a

minor in her vehicle. A.346-47; A.367-77.

Fourth, the government argued that Mr. Turnquist presented a risk of flight and that he failed to rebut the presumption. A.347. The government posited that "even the strictest conditions of release" or the surety bond could not ensure Mr. Turnquist's appearance because the charges were serious, the penalties were significant, and Mr. Turnquist could easily cut his ankle monitor and flee. A.347.

## 2. Mr. Turnquist's arguments in support of his release.

Mr. Turnquist argued that Magistrate Judge McCarthy's order – which the Probation Office supported – was sound and should not be disturbed. First, while conceding that this crime is "serious," Mr. Turnquist pointed out how, at this stage, the charge is nothing more than an unproven allegation – an allegation that will be difficult to prove given the multiple pieces of evidence highlighted by the defense in its motion for release that undermine the credibility of Ms. Kranz, Amanda Turnquist, and several other government witnesses. A.363. Additionally, Mr. Turnquist cautioned how this factor is but one of four factors considered by the Court under 18 U.S.C. §3142(g). A.363.

Second, Mr. Turnquist argued that the weight of the evidence was not as tilted in the government's favor as it proffered. Mr. Turnquist contended that: the fact that Ms. Kranz and others keep repeating the allegations is not evidence of anything, particularly when what people said was the truth at the first trial, was not the truth, and resulted in dismissal; a decade-old observation of a five-year old who

allegedly witnessed sexual behavior was questionable based on M.T.'s age, experience, and developmental delays; Mr. Turnquist and his wife discussing the age of consent when trying to brainstorm legal defenses in a jailhouse call is not an admission, but a desperate (and poor) attempt at jail-house lawyering; Mr. Turnquist denied having sexual activity with Ms. Kranz when she was a child during the March 2020 controlled call telling Ms. Kranz at several points "I don't know what you're talking about" and "that's crap" and that her assertion that the sex was non-consensual when she was 17-18 years old was false; there are no witnesses to the alleged misconduct; there is no forensic evidence to corroborate the alleged sexual activity; Mr. Turnquist denied the allegations in a multi-hour police interrogation; one trial has ended in a dismissal before the government closed its proof; and, the principal witnesses in this case not only harbor motives to lie, but also have lied to the police, the grand jury, and to courts in the past. A.363. Mr. Turnquist also made clear how the Bail Reform Act does not require the Court to resolve this contest to grant pretrial release because this factor is but one of several in the analysis. A.364. And if Mr. Turnquist does not prevail, neither does the government. A.364.

Third, Mr. Turnquist disputed the government's contention that he failed to produce evidence to rebut the presumption of dangerousness or flight other than the $50,000.00 surety. Mr. Turnquist pointed out how evidence regarding Mr. Turnquist's law-abiding history and characteristics and ties to the community was

verified by the Probation Office in the Bail Report, all of which was noted by defense counsel in argument to Magistrate Judge McCarthy. A.364; CA.1-7; A.316-19. The Bail Report proved that Mr. Turnquist has no record, substance abuse problem, or many of the other classic concerns relied up by federal magistrates and judges to deny pretrial release and did not raise any concern that Mr. Turnquist had a track record of failing to comply with court-imposed conditions. A.364-65. Mr. Turnquist also argued that the allegations involved Ms. Kranz only, not his other daughters or stranger-victims, and the conditions imposed by the Magistrate resolved the government's safety concerns. A.365; A.367-69. All of this not just rebutted the presumption, but undermined the government's ability to meet its burden of proof regarding flight and dangerousness.

Fourth, Mr. Turnquist disputed the alleged witness intimidation incident involving Carly Turnquist. The defense argued that confining Mr. Turnquist because of something his wife did was improper and, nevertheless, the evidence surrounding the allegation was weak (Mr. Turnquist presented video evidence of the alleged victim's clam demeanor). A.366-67. The defense also made clear how there was no evidence that Mr. Turnquist participated in or otherwise orchestrated the incident and that the conditions imposed by Magistrate Judge McCarthy (home detention, monitoring, no contact) resolved any safety concerns, particularly when Mr. Turnquist had no history of failing to abide by court orders. A.363.

31

Fifth, Mr. Turnquist argued how the COVID-19 pandemic has impeded his ability to prepare for trial. The defense raised how Genesee County Jail locked down visitation and restricted attorney visitation to telephone calls only after experiencing a surge in COVID-19 infections. A.369. This caused the defense to have to prepare for everything in the case remotely, by telephone and mail only and, in a case containing gigabytes of discovery, such a restriction will make it impossible for Mr. Turnquist and counsel to prepare for trial unlike if he was released. A.369.

## O. The District Court rescinds the Magistrate's order and detains Mr. Turnquist, reasoning that Mr. Turnquist poses a danger to Ms. Kranz and others in the community that was not rebutted and cannot be resolved through imposition of conditions.

District Judge Sinatra heard oral argument on the government's appeal from the prosecution and the defense. A.381-402. District Judge Sinatra asked the government why the conditions imposed by Magistrate Judge McCarthy were insufficient. The government responded that the conditions permitted contact with minors and Mr. Turnquist's alleged conduct with Ms. Kranz combined with the fact that the conditions permitted Carly Turnquist to act as a supervisor did not ensure safety. A.384-385. In response, Mr. Turnquist clarified that if he was released and permitted to live with Carly Turnquist, Mr. Turnquist only would have contact with Carly Turnquist's children (a son and a daughter) as Mr. Turnquist's biological

children no longer live with him.[7]  A.385-87.  The government also contended that Mr. Turnquist is a flight risk based on the penalties he faces if convicted in this case and the other state cases.  A.387.

District Judge Sinatra asked Mr. Turnquist why the presumption was rebutted and why release is appropriate.  A.387-88.  First, the defense reiterated how it is not appropriate to detain Mr. Turnquist based on acts that Carly Turnquist allegedly committed.  A.388.  Second, the defense argued that the government's concern that Mr. Turnquist would commit this type of conduct with his own or other children is overstated since the police investigation and interviews of the minors revealed no evidence of such conduct.  A.288-89.  Third, the defense pointed to the fact that many of the accusers in this case were shown to have made false statements under oath and possess motives to fabricate which undermines the strength of the government's evidence.  A.389.90.  Fourth, the defense argued that Mr. Turnquist's history and characteristics – he has a job, community ties, no criminal record, no failure to appear, no substance abuse history, and cooperated with law enforcement – shows that he is neither a danger nor risk of flight.  A.390-91.  Fifth, the defense pointed out how the government did not articulate how the conditions imposed by Magistrate Judge McCarthy – which included home detention, monitoring, the surety bond, travel restrictions, electronic device monitoring, mental health treatment, and a

---

[7] He also offered to live with his mother or father who have no children.  A.401.

no contact order with witnesses – was inadequate. A.391-92. Sixth, the defense

argued that the conditions in the jail and counsel's obstructed meetings with

Mr. Turnquist because of COVID-19 quarantines was another reason for release. For

all these reasons, the defense believed it had rebutted the presumption, the

government had not met its burden on flight and danger, and the conditions imposed

by Magistrate Judge McCarthy were adequate to order release. A.391-93.

District Judge Sinatra asked the defense whether the corroboration the

government presented in this case made the federal question of release different from

the state cases. A.393. The defense disagreed that things were different because the

evidence presented to all three judges – Magistrate McCarthy and the Erie and

Genesee County judges – was all the same. A.393-94. On top of that, the evidentiary

dispute in the federal case had to do with whether the sexual activity occurred rather

than focusing on a unique federal element of the crime like interstate travel. A.394.

Finally, the defense questioned the strength of the corroboration because M.T. was

5 years old, suffers from developmental delays, and did not say she saw Mr. Turnquist

and Ms. Kranz having "sex"; the controlled call does not contain a "smoking-gun"

admission, but discusses consensual sexual activity in New York; and, the recorded jail

call with Carly Turnquist is nothing more than poor jail-house lawyering. A.394-97.

Finally, the defense pointed out that the Bail Reform Act does not require a defendant

to disprove the allegations against him to secure release; rather, the Act requires

imposition of the least restrictive conditions to ensure safety and appearance only. A.397-98.

District Judge Sinatra next asked the government whether it was important that Mr. Turnquist is not being accused of conduct other than with Ms. Kranz. A.398. The government responded that one victim is enough and that unlike in state court, the presumption applies here (which makes the federal case different) and the law implies detention is appropriate because the type of crime suggests danger. A.398. The government also said that the corroboration is greater in the federal case than the state cases because Mr. Turnquist admitted to sexual activity with Ms. Kranz in the state of New York when she was 17 and, for the Federal charge, "we only need to show that he engaged in this conduct with the victim when she was 17. Under 18. So 17, 16, 15 all apply." A.398-99. The government also argued that the jail call with Carly Turnquist "clearly suggests" that Mr. Turnquist had sex with Ms. Kranz when she was 15 or 16 years old. A.399.

District Judge Sinatra asked the government whether it believes that Mr. Turnquist poses a specific threat to Ms. Kranz. A.399. The government answered in the affirmative stating how she testified at trial that Mr. Turnquist repeatedly abused her over the years and that Ms. Kranz was intimidated by Carly Turnquist. A.399-400. The defense countered by reminding the court that the allegations against Carly Turnquist related to her only and were not proven. A.400.

35

Regarding the threat to Ms. Kranz, the defense argued that the threats alleged by Ms. Kranz suffered from inconsistencies, a lack of corroboration, and were counterintuitive because during the same period that this abuse allegedly occurred, Ms. Kranz chose to live with Mr. Turnquist, chose to speak to him suggestively in text messages, and did not make any allegations to law enforcement. A.400-01.

The defense closed its argument reminding the court that the Bail Reform Act does not require the removal of all danger and any risk of flight to grant pretrial release; rather, the Act requires the court to impose the least restrictive conditions that will reasonably ensure safety and appearance. A.402.

While District Judge Sinatra did not consider any of the allegations concerning Carly Turnquist, he nevertheless granted the government's appeal and ordered Mr. Turnquist detained finding that he was a danger to others and the community, that Mr. Turnquist had not introduced sufficient evidence to rebut the presumption of dangerousness, and that no condition or a combination of conditions would reasonably assure the safety of the community, if he were released pending trial. A.5-6; A.402-406. District Judge Sinatra reasoned that the offense is "serious" and "violent" and carries a mandatory minimum 10-year prison term and a possible life sentence. A.403. The court also considered the corroboration presented by the government (M.T.'s statement, the controlled call, the jail call, and the records regarding Splash Lagoon). A.403. Finally, the court relied upon the threats alleged by

36

Ms. Kranz and the risk of harm to other minors in the community. A.404. Based on these things, District Judge Sinatra found by clear and convincing evidence that Mr. Turnquist posed a danger and that "no condition or combination of conditions will assure the safety of others or the community if Mr. Turnquist were released, pending trial." A.404.

## LEGAL STANDARDS

### A. Legal standard governing pretrial detention/release.

Since the Eighth Amendment to the Constitution states that "[e]xcessive bail shall not be required," U.S. CONST. AMEND VIII, federal law generally disfavors keeping a defendant detained prior to trial and contemplates that "only a limited group of offenders [] should be denied bail pending trial." *United States v. Sabhnani*, 493 F.3d 63, 74-75 (2d Cir. 2007) (citations and quotations omitted). Thus, under the Bail Reform Act, a district court is instructed to order the pre-trial detention of a defendant only if, after a hearing, the judge "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." *See* 18 U.S.C. § 3142(e)(1).

For certain crimes – such as the one charged in this case – the Bail Reform Act contains a presumption that "no condition or combination of conditions will reasonably assure . . . the safety of the community." *See* 18 U.S.C. § 3142(e)(3).

"This presumption may be rebutted by the defendant, who 'bears a limited burden of production . . . by coming forward with evidence that he does not pose a danger to the community.'" *United States v. Mattis*, 963 F.3d 285, 290 (2d Cir. 2020) (quoting *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001)). Importantly, "the burden on the defendant[] is one of production, *not* persuasion." *Mattis*, 963 F.3d at 292 (emphasis in original). "Once a defendant has met his burden of production . . . the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court . . . [and] the government retains the ultimate burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community.'" *Id.* at 290-91; *Mercedes*, 254 F.3d at 436.

When determining whether a defendant poses a danger to the community, the district court must consider the following factors:

> (1) the nature and the circumstances of the offense charged. . .;
> (2) the weight of the evidence against the person;
> (3) the history and characteristics of the person, including [his] character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and . . .
> (4) the nature and seriousness of the danger to any person or to the community that would be posed by the person's release.

*See* 18 U.S.C. § 3142(g); *see also Mattis*, 963 F.3d at 291 (citing *Mercedes*, 254 F.3d at 436 ("To determine whether the presumption[] of dangerousness . . . [is] rebutted, the district court considers" the above factors.)).

      The facts the judicial officer uses to support a finding pursuant to Section 3142(e)(1) that no condition or combination of conditions will reasonably assure the safety of any other person and the community shall be supported by clear and convincing evidence. *See* 18 U.S.C. § 3142 (f)(2). "Clear and convincing evidence" means "something more than 'preponderance of the evidence,' and something less than 'beyond a reasonable doubt.'" *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). In other words, the evidence must support a conclusion of danger to the community "with a high degree of certainty." *Id.*; *see also Chimurenga*, 760 F.2d at 403 (holding that when there is "a strong probability that a person will commit additional crimes if released, the need to protect the community becomes sufficiently compelling that detention is, on balance, appropriate.") (citation omitted). And if the court issues a detention order under § 3142 (e)(1), "the judicial officer shall . . . include written findings of fact and a written statement of the reasons for the detention . . . ." 18 U.S.C § 3142 (i)(1); *Cf. United States v. English*, 629 F.3d 311, 321 (2d Cir. 2011) ("[W]here the court's findings and reasons for issuing a detention order are clearly set out in the written transcript of the hearing, the requirement of a writing is satisfied.").

**B. Legal standard governing appeals of detention orders.**

The Court of Appeals applies a "deferential review to a district court's [bail determination] and will not reverse except for clear error." *Mattis*, 963 F.3d at 291 (citing *Sabhnani*, 493 F.3d at 75; *United States v. LaFontaine*, 210 F.3d 125, 130 (2d Cir. 2000) ("We review the district court's determination that a package of bail conditions will prevent danger to the community for clear error.")). "The clear error standard applies not only to the factual predicates underlying the district court's decision, but 'also to its overall assessment, based on those predicate facts, as to the risk of flight or danger presented by defendant's release.'" *Id.* (quoting *United States v. Abuhamra*, 389 F.3d 309, 317 (2d Cir. 2004)). While "the clearly erroneous standard "plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently," *Anderson v. City of Bessemer City*, 470 U.S. 564, 573 (1985), this Court has cautioned that "a bail determination, which involves mixed questions of law and fact, may not be an obvious case in which to apply the traditional 'clear error' framework cited in *Anderson*," *Mattis*, 963 F.3d at 301 n.2. The Court of Appeals will find clear error only where, "on the entire evidence[, it is] left with the definite and firm conviction that a mistake has been committed." *Mattis*, 963 F.3d at 291 (quoting *Sabhnani*, 493 F.3d at 75 (quotation marks omitted)). However, "the court's ultimate finding may be subject to plenary review if it rests on a predicate finding which reflects a misperception of a legal rule applicable to the particular factor involved."

*United States v. Shakur*, 817 F.2d 189, 197 (2d Cir. 1987).

## ARGUMENT

I. **The District Court clearly erred when it detained Mr. Turnquist pending trial. Mr. Turnquist rebutted the presumption of dangerousness and the conditions imposed by the Magistrate Judge reasonably assured the safety of Ms. Kranz and the community at large.**

In the proceedings below, the government argued for detention on the basis that Mr. Turnquist was both and danger and a flight risk. Magistrate Judge McCarthy disagreed with both arguments and ordered Mr. Turnquist released on conditions. On appeal to the District Court, the government focused its argument on dangerousness. A.387. And the District Court detained Mr. Turnquist on that basis alone, stating that it made no determination regarding flight. Consequently, the reason why Mr. Turnquist remains detained is his perceived dangerousness.

The District Court's conclusions that Mr. Turnquist had not rebutted the presumption of dangerousness and that the government had proven dangerousness by clear and convincing evidence was clearly erroneous. Mr. Turnquist rebutted the presumption at both hearings. On top of that, not only did the government fail to prove dangerousness by clear and convincing evidence, but the conditions imposed by the Magistrate Judge were adequate to ensure the Mr. Turnquist could be safely released pending trial. This Court should reverse this erroneous finding and release Mr. Turnquist forthwith.

**A. The presumption of dangerousness was rebutted. The District Court's conclusion to the contrary applied an incorrect legal standard to reach a conclusion that is not supported by the record.**

Mr. Turnquist agrees that he is subject to the rebuttable presumption. *See* 18 U.S.C. § 3142(e)(3)(E) (listing 18 U.S.C. § 2423 as an offense that triggers the rebuttable presumption). However, he believes the District Court erred by holding him to a different (and higher) legal standard than required under the law to rebut the presumption. Case law makes clear that in the context of a detention hearing the defendant bears a "limited burden" of *production – not persuasion –* to show that he is not such a dangerous person that no conditions will ensure the safety of the community if he is released. *See Mattis*, 963 F.3d at 290; *Mercedes*, 254 F.3d at 436; *see also United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) ("[A] defendant must introduce *some evidence* contrary to the presumed fact in order to rebut the presumption.") (emphasis added).

To this end, Mr. Turnquist presented two motions, A.24-41, A.144-150; A.272-78, A.286-88, and an appeal response, A.358-70, containing multiple exhibits, A.42-102, A.151-271; CA.8-24; A.371-72, that attacked the core of the government's allegations against him as well as the credibility of his accusers, principally Ms. Kranz. This evidence showed how Ms. Kranz was inconsistent with her recollection of events, denied facts under oath that were supported by irrefutable evidence, and possessed strong motives to fabricate the allegations (and even admitted that she

came forward because of some of those reasons[8]).  *See* Facts, Section L & M, *infra*.

The same was presented regarding other witnesses.  *See id.*  In addition to this

affirmative evidence, Mr. Turnquist also submitted to a bail interview with the

Probation Office, who recommended release on conditions.  CA.1-7.  Mr. Turnquist

referenced the Probation Office's report in his written submissions and at oral

argument.  Not only did this evidence cast doubt on the strength and truth of the

allegations levied against Mr. Turnquist by Ms. Kranz, but this evidence and the

verified facts in the bail report showed why Mr. Turnquist was not as dangerous as

the government argued.  Specifically, the evidence proved that Mr. Turnquist:

- did not have a criminal record;

- did not have any record of committing similar offenses against other
  minors;

- did not have any other allegations of sexual misconduct or other criminal
  conduct levied against him by another minor;

---

[8] Ms. Kranz states this explicitly to investigators:

> ... been talking with their father Nick at 1677 Reading Road in West Falls, N.Y. and his current wife -
> Carley.  Miranda stated she decided to disclose what Nick had done to her over concerns with her sisters still
> living with him and from getting a CPS call made on her over allowing her daughter to be watched by her
> mother and a complaint to the dog warden regarding her dog with the possibility of Nick being involved with
> them.  Miranda is aware that Nick is allowing Riley to date and sleep with a 16 year old girl names "Lila"
> possible last name "Ferrel ?" who is from Silver Creek, N.Y. Riley also has (2) face book accounts and Nick
> never allowed her to have any.  Miranda's mother knows about everything now and all of Nick's family knows
> that he was having sex with her but only told them that it was when she turned 18 and on -no one knows that
> is started when she was 12 years old.  Miranda also states that his current wife Carly was doing sex things to

A.38.

- did not have any record or allegations against him involving a violent
  offense other than the allegations levied by Ms. Kranz;

- did not have a history of intimidating witnesses;

- did not have a history of disregarding court orders;

- had a history of abiding by court-imposed orders of protection since his
  arrest in April 2020;

- had a history of employment in civil-service, first-responder-type jobs which
  required him to abide by directives of civil authorities;

- had a history of cooperation with law enforcement, to include this case; and

- had a track-record of holding respect for the law throughout his life.

This is why the District Court's conclusion that Mr. Turnquist failed to rebut the

presumption of dangerousness is puzzling just as much as it is clearly erroneous.

Even though his burden to produce evidence was "limited,"

Mr. Turnquist presented multiple pieces of evidence to rebut the presumption. All of

these submissions and arguments constituted "some evidence contrary to the

presumed fact" of dangerousness. *See Rodriguez*, 950 F.2d at 88. Furthermore, the

evidence presented was not just proffered statements of an attorney; instead, the

evidence constituted transcripts, documents, sworn statements, videos, and a verified

bail report that corroborated all of the arguments made by counsel. This is why the

presumption was adequately rebutted. Simply put, the District Court conclusion otherwise finds no support in the record. This should lead to a "definite and firm conviction that a mistake [was] committed." *Mattis*, 963 F.3d at 291. If upheld, not only would this Court leave that mistake uncorrected, it also would countenance a decision that flips the standard from one of "limited production" to one of "persuasion," something this Court has made clear is not the correct standard. Because the District Court misapplied the law, its legal conclusion regarding the rebuttable presumption was clearly erroneous and should be disregarded.

### B. The District Court's conclusion that dangerousness was proven by clear and convincing evidence and that no conditions would reasonably address those concerns was clearly erroneous.

The District Court chose to do what three other judges had not – detain Mr. Turnquist and give him no chance at bail based on the same evidence. While it is true that the District Court had the ability to do this, such authority does not make the decision on bail right or just for several reasons. As set forth below, this Court should overturn the decision below and release Mr. Turnquist on conditions.

#### 1. The District Court placed too much weight on nature of the offense and weight of the evidence prongs.

The District Court did not reduce its reasons for detention into writing, so the transcript, A.402-404, is the only thing that documents the District Court's reasons for detention and its balancing of the 3142(g) factors. The transcript is thin, but provides some insight into what the District Court emphasized (and did not).

45

Regarding the nature and circumstances of the offense, the District Court concluded that the alleged offense was a "serious" and "violent" crime involving a minor that carried significant penalties. A.403. The defense did not dispute this finding below and will not dispute it here. Arguably, the government prevails on this prong based on what is charged in the indictment alone. Yet, this is but one factor in the analysis.

Regarding the weight of the evidence, there was some discussion regarding this prong at oral argument. The District Court asked the parties questions about the evidence presented to the Magistrate Judge and in the appeal documents. The District Court mentioned the corroboration provided by the government in its questions (i.e., the controlled call, the jail call, and M.T.'s statement), A.393-398, and in its decision denying Mr. Turnquist's request for release, A.403, but it did not ask any questions or comment about the concerns raised by Mr. Turnquist regarding the strength of this "corroboration evidence" or the alleged victim's and other witnesses' motives and inconsistent (and sometimes demonstrably false) statements. Mr. Turnquist has concerns about this because it does not appear this evidence was considered and the District Court appears to have disregarded the presumption of innocence in reaching its detention decision. *See* 18 U.S.C. § 3142(j).

For example, the District Court makes no comment about how Mr. Turnquist aggressively contested the government's proffer and about how that

proffer did not include physical or forensic evidence to corroborate Ms. Kranz's allegations. This is important to the analysis. *See, e.g., United States v. Jackson*, 823 F.2d 4, 7 (2d Cir. 1987) (upholding detention because "the government apparently has numerous informants as well as physical evidence to support its charges" and the defense "made no significant attack on the government's proffered evidence"). The District Court also did not discuss how the "weight of the evidence" relates to the likelihood that Mr. Turnquist will commit additional crimes and, thus, is a danger to another person or the community. This is an important factor, too. *See United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985) (Kennedy, J.). Finally, case law consistently has warned district courts to be cautious when weighing this factor because pretrial detention cannot be used as punishment for an unproven charge. For this reason, many courts have suggested that the weight of the evidence is the least important of the 3142(g) factors. *See, e.g., United States v. Alston*, 420 F.2d 176, 179 (D.C. Cir. 1969); *accord Motamedi*, 767 F.2d at 1408; *United States v. Mendez*, No. 19-CR-00245-EAW, 2020 U.S. Dist. LEXIS 105823, at *12 (W.D.N.Y. June 17, 2020).

Here, the transcript proves that the District Court was not cautious and afforded this factor undue weight. Its opinion does not explain what, if any, balancing took place or how the District Court resolved that balance to find not just that Mr. Turnquist was dangerous, but that detaining him was the only means to ensure safety. This should leave this Court with a "definite and firm conviction that a

mistake [was] committed." *Mattis*, 963 F.3d at 291. As such, the District Court's

conclusion was clearly erroneous and grounds exist for reversal.

> **2. The District Court appears to have found that Mr. Turnquist's history and characteristics did not warrant release. This finding is unsupported in the record and contrary to case law.**

Regarding the defendant's history and characteristics, the District

Court's decision barely mentions this factor at all and provides no analysis indicating

whether Mr. Turnquist prevails on this factor and, if not, why the government

prevails, however it appears the District Court still ruled against the defendant.

Mr. Turnquist briefed the District Court and Magistrate Judge regarding why the

defendant's history and characteristics do not support a finding of dangerousness or

risk of flight. A.24-41, A.144-150; A.272-78, A.286-88, A.358-70, A.292-93; A.316-18;

A.390-93, A.397-98. Like the District Court, the government ignored this prong and

provided little argument on this prong of the test. This omission is conspicuous and

disturbing because, unlike the "weight of the evidence" prong, which often is referred

to as the "least important" factor, the history and characteristics prong goes to the

"meat and potatoes" of the analysis. And it was undisputed in the proceedings below

that Mr. Turnquist does not have a criminal history, substance abuse problem, lack of

employment and community ties, supervision violations, or some of the other typical "red flags"[9] that cause courts to find against the defendant on this factor.

The District Court appears to have found against Mr. Turnquist on this factor even though the manifest weight of the evidence and case law suggests the opposite conclusion should have been reached. Such a conclusion, that is not backed by analysis and specific reasoning, should leave this Court with a "definite and firm conviction that a mistake [was] committed." *Mattis*, 963 F.3d at 291. As a result, this Court should find the District Court's conclusion on this prong was clearly erroneous.

### 3. The District Court found dangerousness, but did not address why conditions of release were inadequate to resolve those concerns and ensure safety.

Regarding dangerousness, the government spent extensive time arguing that Mr. Turnquist would engage in witness tampering and other misconduct because

---

[9] *See, e.g., United States v. Rivera-Banchs,* No. 6:20-CR-06046 EAW, 2020 U.S. Dist. LEXIS 228063, at *13 (W.D.N.Y. Dec. 4, 2020) (finding against the defendant because of several prior felony convictions (some for firearms) dating back 25 years and a probation revocation); *United States v. Parker*, 65 F. Supp. 3d 358, 366 (W.D.N.Y. 2014) (finding against defendant because he violated his conditions of release, abused drugs, and had an unstable mental health history); *United States v. O'Connor*, No. 08-CR-0077, 2008 U.S. Dist. LEXIS 26605, at *8-*9 (N.D.N.Y. Apr. 2, 2008) (finding against defendant because she had mental health, social, and drug abuse problems, no family ties, violation of court orders, no employment, and an extensive criminal history); *United States v. Renford*, No. 20-CR-80-A, 2020 U.S. Dist. LEXIS 133159, at *20-*21 (W.D.N.Y. July 28, 2020) (finding against the defendant because he had a recent history of criminal convictions, failure to appear, commission of additional crimes on supervision, mental health conditions, lack of stable employment, and multiple orders of protection).

his wife, Carly Turnquist, allegedly did so.  A.383-85.  In the end, the District Court did not consider any of those allegations when determining that Mr. Turnquist was a danger to Ms. Kranz and others in the community.  A.402.  Instead, the District Court focused on what Mr. Turnquist allegedly did to Ms. Kranz and how that alleged conduct created a danger to her and others in the community.  A.398-404.

In finding against Mr. Turnquist, once again, the District Court does not explain its reasoning other than to note that it "considered" the threats related to Ms. Kranz "[e]ven though they are dated," A.403-04, as well as Mr. Turnquist's "potential access to other minors," A.404.  This is problematic for several reasons. First, the defense specifically rebutted the government's concern about Mr. Turnquist engaging in this type of conduct with other members of his family.  The defense noted how *all* minor children were interviewed and *none* alleged abuse.  A.389.  As such, this concern is speculative, at best, because the government never marshalled any evidence to prove it.  Second, the defense noted how there is no evidence that Mr. Turnquist engaged in this type of conduct with any non-biological children, either.  A.389.  As such, the government's concern is equally speculative.  Third, the defense produced evidence that Ms. Kranz had a motive to fabricate, lied under oath, and was inconsistent with her recollection of the allegations.  A.400-01.  The defense pointed out how the government did not produce evidence of any recent acts of witness intimidation or threats and that Ms. Kranz's behavior belied her allegations

50

because she continued to live with her "abuser" for years and never raised any allegations of "threats" and "physical abuse" until recently. A.400-01. All of this calls into question her claims of physical and sexual abuse and/or threats. With so many questions surrounding these allegations, it is difficult to understand how the District Court concluded that the government proved dangerousness by "clear and convincing" evidence. *Chimurenga*, 760 F.2d at 405 (holding that the evidence must support a conclusion of danger "with a high degree of certainty.").

Beyond that deficiency, though, the most serious flaw in the District Court's decision revolves around its failure to address why the conditions imposed by Magistrate Judge McCarthy – or a different set of conditions imposed by the District Court – are inadequate to ensure the safety of Ms. Kranz, Mr. Turnquist's minor children, and others in the community. At oral argument, the District Court asked the government why Magistrate Judge McCarthy's conditions are insufficient. A-383. The government responded that the conditions are inadequate because Magistrate Judge McCarthy permitted contact with "underage minors" and that "supervision is not sufficient," particularly if Carly Turnquist is the supervisor, to protect minors. A.383-85. After devoting the majority of its discussion to this reason, the government closed by stating generally: "just given his history . . . we have grave concerns about the danger he poses . . . to the community." A.385. In contrast, Mr. Turnquist explained how the conditions proposed by Magistrate Judge McCarthy and Probation

will ensure safety, A.391-93, and if the District Court did have concerns over contact

with minors, then the appropriate response was to impose a condition that prevented

Carly Turnquist from acting as a supervisor or that restricted Mr. Turnquist's contact

with minors altogether rather than imposing detention because the Bail Reform Act

defaults to the least restrictive conditions, not the most restrictive and/or detention,

A.401-02. It appears these arguments were disregarded. This should raise concern.

      As Mr. Turnquist argued below, pretrial release under the Bail Reform

Act does not require conditions, financial or otherwise, that *guarantee* appearance or

*remove all risk* of danger. As deceased Magistrate Judge Hugh Scott summarized

several years ago:

> Despite its willingness to allow defendant a chance at
> release, the Court acknowledges that "the enforcement of
> all constitutional restraints upon government in its efforts
> to administer the criminal law entails risks." *United States v.*
> *Gonzales Claudio*, 806 F.2d 334, 343 (2d Cir. 1986), *superseded*
> *in part on other grounds by* Fed. R. Crim P. 5(c). **"That, of**
> **course, is true of every defendant released on**
> **conditions; it is also not the standard authorized by**
> **law for determining whether pretrial detention is**
> **appropriate. Section 3142 speaks of conditions that**
> **will 'reasonably' assure appearance, not guarantee it."**
> *United States v. Xulam*, 84 F.3d 441, 444, 318 U.S. App. D.C.
> 1 (D.C. Cir. 1996) (citation omitted).

*United States v. Albannaa*, No. 12-CR-174S, 2013 U.S. Dist. LEXIS 135618, at *9

(W.D.N.Y. Sep. 23, 2013) (Scott, J.) (emphasis added). Yet, that is exactly what the

government argued for below and what the District Court appears to have adopted.

As this Court knows, a district court is required to impose *the least restrictive conditions* possible that will *reasonably* assure the defendant's appearance and the safety of the public because detention is a matter of last resort. *See* 18 U.S.C. § 3142(c)(1)(B). Home detention, orders of protection, digital device restrictions, living arrangements, electronic monitoring, and probation supervision are some of many conditions that were/could be imposed to mitigate the risk of danger in this case. This is particularly true in a case where a defendant does not have a history of criminal activity, failure to abide by court orders, or making recent and verified threats against a victim/witness – all of which, when present, are facts courts have concluded would make such conditions inadequate. *See, e.g., Rivera-Banchs,* 2020 U.S. Dist. LEXIS 228063, at *13-*15; *United States v. Jones*, No. 08-MJ-1228-HBP, 2008 U.S. Dist. LEXIS 46116, at *16-*18 (S.D.N.Y. Jun.11, 2008). Here, the District Court did not even attempt to impose those conditions. Making matters worse, the District Court offered no explanation as to why they were inadequate. Not only should this leave this Court with a "definite and firm conviction that a mistake [was] committed," *Mattis*, 963 F.3d at 291, but it also should lead this Court to conclude that the District Court's conclusion on this prong was clearly erroneous.

#     #     #

Mr. Turnquist believes that the 3142(g) factors weigh in his favor. He may not win every factor and the balancing test may be closer on some factors than

others, but even if that is the case, the evidence he produced before the District Court

was substantial, non-conclusory, and compelling.  Furthermore, the government had

the burden to produce clear and convincing evidence of dangerousness such that

there was "a strong probability" that Mr. Turnquist "will commit additional crimes if

released."  *See Chimurenga*, 760 F.2d at 403.  Such evidence was absent from the

government's proffer as much of the government's argument revolved around the

fact that Ms. Kranz made serious allegations and kept repeating the allegations under

oath.  This argument not only was conclusory and circular, but it also ignored how her

recitations were inconsistent with her own prior statements and incongruent with

other "witnesses" recollections.  The District Court's adoption of this narrative, to the

exclusion of other evidence, and without explanation as to why, was a mistake and

clearly erroneous.  For these reasons, this Court should find clear error and reverse.

### C. The District Court failed to address Mr. Turnquist's concern that his ability to prepare for trial was hampered by his continued incarceration.

Mr. Turnquist also asked for release on conditions because he was

having trouble preparing for trial.  A.369.  The trouble stemmed from a COVID-19

lockdown of the local jail within which he was housed.  To prevent the spread of the

virus, the local jail suspended all attorney visitation and counsel and Mr. Turnquist

were relegated to preparing for his detention hearing and this trial through the mail

and over the phone.  This is wholeheartedly inadequate.  A review of the record proves why.

Following submission of the government's response, counsel for Mr. Turnquist attempted to visit to prepare the reply.  That was prevented by the jail and, as a result, Mr. Turnquist had to move for an extension of time.  A.142-43.  Thereafter, oral argument had to proceed virtually because Mr. Turnquist could not be produced in person.  A.4.  After submitting his second motion for release, oral argument had to proceed once again by telephone because Mr. Turnquist could not be produced and the local jail's video conferencing experienced technical issues.  A.4.  Later on appeal, oral argument before the District Court had to be rescheduled once because of difficulties with producing the defendant.  A.5.

The delays and scheduling difficulties experienced by the court are just a microcosm of the difficulties faced by the defense when attempting to coordinate time to prepare for trial.  Quarantine restrictions require counsel to review documents and computer-based evidence with Mr. Turnquist through a glass window.  It is difficult to hear each other.  Mr. Turnquist is unable to use a computer in the jail.  He cannot review electronic discovery on his own time.  And he and his counsel must print and mail the thousands of pages of discovery in this case to review it.  This is not ideal.  It limits Mr. Turnquist's ability to prepare, something that is deeply frustrating to him.

These impediments would end if Mr. Turnquist was subject to home detention and could review this evidence on his own computer at home and/or discuss it with his counsel at his attorney's office face-to-face rather than behind a glass wall. Yet, the District Court ignored this plea, failing to make a finding or comment about it at all in its detention decision. This is another clearly erroneous "mistake" that this Court should address. Like the other deficiencies above, this Court should reverse on this basis and release Mr. Turnquist on conditions.

## CONCLUSION

This Court should vacate the District Court's detention order and order Mr. Turnquist released on the conditions recommend by Magistrate Judge McCarthy or, in the alternative, on other conditions this Court deems necessary to ensure the safety of others and the community.

Dated: November 3, 2021
      Buffalo, New York

**SINGER LEGAL PLLC**

By:＿＿ s/ Robert C. Singer, Esq.＿＿＿＿
      Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com

## CERTIFICATE OF COMPLIANCE

The foregoing brief complies with the length restrictions in Fed. R. App. P. 32(a)(7)(B)(i) because it contains 12,888 words, including headings, footnotes and quotations, but excluding the parts exempted by Fed. R. App. P. 32(f). This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in proportionately spaced typeface using Microsoft Word 2010 and in 14-point Garamond font.

Dated: November 3, 2021
Buffalo, New York

**SINGER LEGAL PLLC**

By:＿＿s/ Robert C. Singer, Esq.＿＿＿＿
Robert C. Singer, Esq.
80 East Spring Street
Williamsville, New York 14221
(716) 222-3288
rob@singerlegalpllc.com